FILED BY _____ D.C.

JUL 1 8 2016

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 16-80688-CIV-ZLOCH/HUNT

**John Pinson,**

      Plaintiff

vs

**JPMorgan Chase Bank, N.A.**

      Defendant     /

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff John Pinson respectfully opposes the motion to dismiss filed by JPMorgan Chase Bank NA ("Chase") and asserts that the motion should be denied, for the following reasons:

### INTRODUCTION

Lacking in authority and avoiding serious analysis of the issues, Chase resorts to an onslaught of hyperbole to obscure the facts that support Pinson's claims. Chase denigrates Pinson's damage proof with pejoratives such as: "serial pro se filer", "typically alleging", "litigious odyssey", "host of similarly", "shotgun pleading", "re-argues theories", "wholly fails", "fail independently", "failed to raise", "could not state", "borderline incomprehensible", "seems to predicate", "summary rejection", "allegation is false", "patently false complaint", "factually deficient", "cannot explain", "no effort to explain", "wholly fails to provide", "Laundry list", "allegedly incurred", "does not plead", "conspicuously absent", "Boilerplate recitation", and "fails to sufficiently". Chase belittles Pinson with still more dismissive adjectives such as "frivolous", "rejected", "persists", "dissatisfaction", "insufficient", "deficiencies", "futile", "concerning" Chase provides no reference to the record to support these fantastical characterizations. Chase repeatedly fabricates and falsely attributes statements to Pinson which never made in his complaint. Chase even proffers a direct citation non-existent in the summary judgment Order cited. While Chase's approach is concededly imaginative, Pinson suggests a return to the facts and the law to resolve the issues raised by the motion to dismiss.

### Facts and Law

The gravamen of Pinson's Complaint is that Chase has damaged Pinson's credit report and credit scores by their debt collection activity and by obtaining Pinson's credit report. According

to Pinson, these activities violated the FCRA, the FDCPA and the FCCPA. The purpose of the FCRA is to ensure accuracy and fairness of credit reporting. 15 U.S.C. § 1681. The FDCPA serves to eliminate abusive debt collection practices by debt collectors. 15 U.S.C. § 1692. The FCCPA serves a similar purpose to the FDCPA. Florida Statutes § 559.72.

Pinson admits no debt in his complaint; asserts any alleged debt is disputed; asserts any alleged debt is a consumer debt; and that "CHASE has represented itself in written communications as Plaintiff's creditor" *Complaint* ¶59

Chase argues Pinson's FDCPA claim in the instant action must be denied because the Court dismissed his previous Chase FDCPA action, yet Chase fails to discuss the critical issue of whether the two actions under consideration are based on the same nucleus of operative facts.

Pinson's complaint states clearly "[t]he operative fact giving rise to the alleged FDCPA violations in the instant complaint occurred on April 30, 2015, after judgment in the previous action, and this action has a separate and distinct nucleus of operative facts from the previous action." *Compl.* ¶38.

Chase erroneously asserts "[t]he facts here have not changed and Chase is excluded from "debt collector" status pursuant to 15 U.S.C. § 1692a(6)(F)(iii)" (MTD pg.5 ¶2), yet here, within the four corners of Pinson's complaint, the operative facts are separate, distinct, and place Chase squarely in the crosshairs of the FDCPA, as discussed *infra*.

15 U.S.C. § 1692a(6) states in pertinent part:

> **… Notwithstanding the exclusion provided by clause (F)** of the last sentence of this paragraph, the term ["debt collector"] includes **any creditor** who, in the process of collecting **his own** debts, uses **any name other than his own** which would indicate that a third person is collecting or attempting to collect such debts.[1],[2] (emphasis added).

"CHASE has represented itself in written communications as Plaintiff's creditor." Compl.¶59. "Plaintiff does not have an account with Chase Home Finance LLC.' *Id.* at ¶40. "JPMorgan Chase Bank NA ("Chase") and Chase Home Finance LLC are distinctly different and separately incorporated legal entities." *Id.* at ¶57. "Plaintiff contends JPMorgan Chase Bank NA used a name other than its true name" *Id.* at ¶58 and "falsely and erroneously listed Chase Home Finance LLC on the [TransUnion] trade line" id.¶56 "The May 29, 2015 TransUnion

---

[1] 15 U.S.C. § 1692a(6). The "false names" sentence first appeared in House Consumer Affairs Subcommittee prints in April 1976. It was present in all the major Senate bills.

[2] With any statutory phrase, the Court must "presume that Congress said what it meant and meant what it said." *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir.1998) (en banc).

consumer report indicated the Chase Home Finance LLC trade line information update was furnished on April 30, 2015" *Id.* at ¶55, thus Pinson's April 29, 2016, complaint was filed within the FDCPA's one year statute of limitations. Chase fails to deny creditor status. Chase fails to deny it reported the trade line. Chase fails to controvert Plaintiff's fact assertions.

> 15 U.S.C. § 1692e
> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
> … (14) The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization. 15 U.S.C. § 1692e(14)[3]

Pinson "contends that during the past 12 months CHASE communicated and furnished false and erroneous information to national consumer reporting agency TransUnion regarding a debt which CHASE knew or should have known was false." *Id.* at ¶54.  Chase fails to controvert Plaintiff's fact assertions.

"Reporting debts on consumer reports is one of the most commonly-used arrows in the debt collector's quiver" *Id.* at ¶68, and in using a false name as discussed *supra* Chase "us[ed] false representation or deceptive means to collect or attempt to collect any debt from Plaintiff." *Id.* at ¶170

Further, "CHASE masqueraded as CHASE BANK USA NA in its certification of identity to Experian to obtain the report on Plaintiff" *Id.* at ¶130 and in doing so "us[ed] false representation or deceptive means to obtain information from a consumer reporting agency on Plaintiff." *Id.* at ¶169

> 15 U.S.C. § 1692e(10)
> [T]he following conduct is a violation of this section:…
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. 15 U.S.C. § 1692e(10)[4]

Despite Pinson's "repeated disputes of the debt with CHASE" *Id.* at ¶76 and "repeated disputes sent to TransUnion and TransUnion's investigation and re-investigation of the dispute with Defendants, the Defendants continued to furnish false and erroneous information to consumer

---

[3] 15 U.S.C. § 1692e(14). Somewhat different provisions addressing the use of fictitious names were contained in the initial House bill and were deleted in subsequent House bills. H.R. 10191, 94th Cong., 1st Sess. § 804(3), (5) (1975). Major Senate bills prohibited the use of any alias or fictitious name. The present language was first adopted by the Senate Consumer Affairs Subcommittee. Compare S. 3838, 94th Cong., 1st Sess. § 806(17) (1976), and S. 918, 95th Cong., 1st Sess. § 807(17) (1977), with Senate Comm. Print No. 1, 95th Cong., 1st Sess. § 807(14) (1977).
[4] 15 U.S.C. § 1692e(10). This provision first appeared in its present form in H.R. 13720 94th Cong., 2d Sess. § 806(10) (1976) and was contained in each subsequent major bill leading to the Act.

reporting agency TransUnion." *Id.* at ¶75 "Specifically, the Defendant continued to report the disputed debt on the Plaintiff's credit reports in an effort to collect the debt." *Id.* at ¶172 Pinson's complaint notes "[d]efendant's alleged violations are ongoing" *Id.* at ¶156  and after Pinson filed the instant complaint, the remark "ACCT INFO DISPUTED BY CONSUMR" was removed from the trade line, by the furnisher, despite the account continuing to be disputed and contrary to § 1692e(8).

> 15 U.S.C. § 1692e(8)
> [T]he following conduct is a violation of this section:…
> (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed. 15 U.S.C. § 1692e(8).[5]

## ARGUMENT

### Notice Pleading

Under the federal practice of "notice pleading," Plaintiff must provide a short and plain statement of the claims alleging he is entitled to relief. Federal Rule of Civil Procedure 8(a); *Janke Construction Co. v. Vulcan Materials Co.*, 527 F.2d 772 (7th Cir. 1974); *Hrubec v. Nat. R. Pass. Corp.*, 981 F.2d 962 (7th Cir. 1992).  Plaintiff is not required under Rule 8(a) to allege a cause of action or legal theory of the case. *Hostrop v. Board of Junior College District No. 1*, 523 F.2d 569 (7th Cir. 1975), cert. denied, 425 U.S. 963, 48 L. Ed. 2d 208, 96 S. Ct. 1748 (1975).  There are "no technical forms of pleading" and Plaintiff's Original Complaint conforms with Rules 8(a), 8(e), 8(f) and 10 of the Federal Rules of Civil Procedure. *Maynard v. General Electric Company*, 486 F.2d 538 (4th Cir. 1973).  Plaintiff is only required to set forth a short, concise and plain statement of their claim sufficient to advise the opposing party of the nature of the claim. *Neizil v. Williams*, 543 F. Supp. 899 (U.S.D.C. M.D. Fla. 1982); *Ambling v. Blackstone Cattle Co.*, 658 F. Supp. 1459 (U.S.D.C. N.D. Ill. 1987).  The complaint must be in general terms and need not be stated within a framework of a cause of action. *Stanley v. Harper Buffing Machine Co.*, 28 F.R.D. 579 (U.S.D.C. Conn. 1961).  Legal conclusions or statements of law must not be alleged in the complaint. *Curacao Trading Co. v. Fed. Ins. Co.*, 3 F.R.D. 203 (U.S.D.C. N.Y. 1942).  Further, plaintiff need not allege a theory of action. *Id.*  Plaintiff need not specify under what law(s) his case arises. *Ghebreslassie v. Coleman Secur. Svc.*, 829 F.2d 892 (9th Cir. 1987).  Plaintiff need not plead state laws. *Lumbermans Mut. Cas. Co. v. Norris Grain*

---

[5] A provision similar to this section was contained in each major bill leading to the Act. E.g., H.R. 10191, 94th Cong., 1st Sess. § 802(9), (12) (1975); H.R. 13720, 94th Cong., 2d Sess. § 806(7) (1976).

*Co.*, 343 F.2d 670 (8th Cir. 1965).  State laws should not be plead as the federal court will take judicial notice of applicable state laws. *Bower v. Casanave*, 44 F. Supp. 501 (U.S.D.C. N.Y. 1941).  Plaintiff need not state his legal theories and discuss all applicable laws or laws which might be applied by the court.  Federal courts employ notice pleadings. Pinson has done much more than merely put Defendants on notice of his claims. Fed.R.Civ.Proc. 8.

### CHASE's Motion to Dismiss Should Be Denied

Pursuant to Federal Rules of Civil Procedure 12(b) (6), and the jurisprudence construing same, when faced with a Motion to Dismiss under Rule 12(b) (6), the court must treat the facts alleged in the complaint as admitted. *Ward v Hudnall*, 366 F.2d 247 (5th Cir. 1966); *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982). Furthermore, the complaint is sufficient if it shows that plaintiff is entitled to any relief, regardless of whether it alleged the proper theory of the case. *Janke Construction Co. v. Vulcan Materials Co.*, 527 F.2d 772 (7th Cir. 1974); *Neitzke v. Williams*, 490 U.S. 319, 109 S. Ct. 1827, 1833 (1989).  Plaintiff's allegations must be treated and presumed as true and correct in all respects and plaintiff's factual allegations are to be liberally construed so that plaintiff is likewise afforded each and every favorable inference to be drawn therefrom. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S. Ct. 1683 (1974); *Miree v. Dekalb County, Georgia*, 433 U.S. 25, 97 S. Ct. 2490 (1977).  If admitted and taken as true, the allegations of the plaintiff's complaint do state claims upon which relief can be granted.

Motions to Dismiss are not favored and are granted only when it appears to a certainty that no set of facts could be proven at trial which would entitle plaintiff to any relief. *Dann v. Studebaker-Packard Corp.*, 288 F.2d 201 (6th Cir. 1961).

### Pinson's Claims Are Not Frivolous

In their MTD, Chase calumniates Pinson a "serial *pro se* litigant" on a "litigation oddesy" and alludes to his legal actions as "similarly frivolous", but Chase fails to explain which, if any, of these cases were dismissed as frivolous. The record shows none were found frivolous.

In Mack v. Progressive, Mr. Mack faced an analogous argument and Hon. Judge Mazzant's Order on Motion for Bond (Doc. 28) is instructive.

> Defendant points the Court to twenty cases filed by Plaintiff in this district, but fails to explain which, if any, of these cases were dismissed as frivolous. The fact, by itself, that Plaintiff files a large number of cases does not make him vexatious. Plaintiff has a right

to sue for violation of his rights, and this Court has never found that Plaintiff abused the process in his prior litigation.
*Mack v. Progressive Financial Services, Inc.*, No. 4:13cv544 (E.D. Tex. Mar. 24, 2014).

In another action, Mack v. Midland, Hon. Judge Mazzant issued a similarly instructive Report (Doc. 25) on November 25, 2014.

Because the Court declines to find that the lawsuits, as a matter of law, arise from the same nucleus of operative facts, there is nothing before the Court at this time that would indicate any "vexatious, harassing, or duplicative" conduct by Plaintiff. In any event, it seems to the Court that, if Defendant stopped calling Plaintiff, Plaintiff would stop filing suits against it.
*Mack v. Midland Credit Management, Inc.*, No. 4:14cv414 (E.D. Tex. Mar. 23, 2015).

It is axiomatic that if Chase ceased its offensive behavior delineated in his complaint, Pinson would stop filing suits against it. Yet, despite Chase's pettifoggery, the court may only consider the four corners of the complaint and the exhibits attached to the complaint when deciding a motion to dismiss. *See Grossman v. Nationsbank NA.*, 225 F.3d 1228, 1231 (11th Cir. 2000).

### The FDCPA Protects Consumers Like Pinson

The FDCPA "provides a remedy for consumers who are subjected to abusive, deceptive, or unfair trade collection practices by debt collectors." *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 400 (3d Circ 2000). A single violation of the Act triggers statutory liability and remedies., *Morgan v. Credit Adjustment Board, Inc.,* 999 F.Supp. 803 (E.D.Va. 1998); *Clomon v. Jackson*, 988 F.2d 1314 (2nd Cir. 1993). The FDCPA, 15 U.S.C. § 1692, et seq., is a strict liability statute, *Taylor v. Perrin, Landry deLaunay & Durand*, 103 F.3d 1232 (5th Cir. 1997). "Because the Act imposes strict liability, a consumer need not show intentional conduct by the debt collector to be entitled to damages." *Russell v. Equifax, A.R.S.*, 74 F. 3d 30, 33-34 (2' Cir. 1996)."Because the FDCPA, like the Truth in Lending Act (TILA) 15 U.S.C. § 1601 et seq., is a remedial statute, it should be construed liberally in favor of the consumer." *Johnson v. Riddle*, 305 F.3d 1107 (10th Cir. 2002). The 11th Cir "employ[s] the "least-sophisticated consumer" standard to evaluate whether a debt collector's communication violates § 1692e of the FDCPA." *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185 (11th Cir. 2010). "The basic purpose of the `least-sophisticated consumer' standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd." *Clomon v. Jackson*, 988 F.2d 1314 (2d Cir. 1993). The FDCPA is "an extraordinarily broad statute" and must be enforced "as Congress has written it." *Frey v. Gangwish*, 970 F.2d 1516 (6th Cir. 1992). "The Act is designed to protect consumers who have

been victimized by unscrupulous debt collectors, regardless of whether a valid debt actually exists." *Baker v. G.C. Servs. Corp.*, 677 F.2d 775, 777 (9th Cir. 1982). In his complaint, Pinson admits no debt; asserts any alleged debt is disputed; asserts any alleged debt is a consumer debt; and that "CHASE has represented itself in written communications as Plaintiff's creditor" Compl. ¶59

### As Pled Chase is a "Debt Collector" under the FDCPA

As a threshold matter, as pled in Pinson's complaint, Chase meets the statutory definition of "debt collector" under FDCPA as discussed *supra*. The Act extends to a creditor who "uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts" *Catencamp v. Cendant Timeshare Resort*, 471 F.3d. 780 (7th Cir. 2006). In *Catencamp* the Seventh Circuit held that a creditor sending a letter that appeared to be from a third-party debt collector became a "debt collector" subject to all of the FDCPA's requirements. In *Lester E. Cox Med., Springfield, MO. v. Huntsman*, 408 F.3d 989 (8th Cir. 2005), the Eighth Circuit affirms district court finding that the creditor was a debt collector that participated in interstate commerce under 15 U.S.C. § 1692a and that it used a false and misleading name to collect its debts in violation of the anti-fraud provisions of 15 U.S.C. § 1692e(14) of the FDCPA.

"[F]or the FDCPA to apply, two threshold criteria must be met: (1) the defendant must qualify as a 'debt collector'; and (2) the communication must have been made in connection with the collection of any debt." *Lara v. Specialized Loan Servicing, LLC*, 2013 WL 4768004, *3 (S.D. Fla. Sept. 6, 2013). Here, Chase is a "debt collector" as discussed *supra*, and its credit reporting is an act of debt collection. "The Court has learned, through its work on countless FDCPA cases, that threatening to report and reporting debts to CRAs is one of the most commonly-used arrows in the debt collector's quiver." *Edeh v. Midland Credit Management, Inc.*, 748 F. Supp. 2d 1030 (D. Minn. 2010). "the Court finds that Midland was engaged in "collection of the debt" ... when it reported Edeh's disputed debt to the [credit reporting agencies]" Id. Regularly collecting occurs when undertaking collection activity "more than a handful of times per year" - *Crossley v. Lieberman*, 868 F. 2d 566 (3rd Cir. 1989).

### Chase Violated FDCPA 15 U.S.C. § 1692e

FDCPA claims focus on the misconduct of the debt collector, regardless of the existence, or amount, of any debt that the debtor might owe. *Karnette v. Wolpoff & Abramson, L.L.P.*, 2007

U.S. Dist. LEXIS 20794 (E.D. Va. March 23, 2007). The focus is on the debt collector's conduct, not the consumer's. *Keele v. Wexler*, 149 F.3d 589 (7th Cir. 1998).

The FDCPA prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. "That means in order to state a plausible FDCPA claim under § 1692e, a plaintiff must allege, among other things, (1) that the defendant is a 'debt collector' and (2) that the challenged conduct is related to debt collection." *Reese v. Ellis, Painter, Ratteree & Adams, LLP*, 678 F.3d 1211, 1216 (11th Cir.2012). Here, Chase is a "debt collector" as discussed supra, and credit reporting is debt collection. Chase as a "debt collector" reported false credit information about Pinson. "The Court has learned, through its work on countless FDCPA cases, that threatening to report and reporting debts to CRAs is one of the most commonly-used arrows in the debt collector's quiver." *Edeh v. Midland Credit Management, Inc.*, 748 F. Supp. 2d 1030 (D. Minn. 2010). "the Court finds that Midland was engaged in "collection of the debt" ... when it reported Edeh's disputed debt to the [credit reporting agencies]" *Id.*

### Chase Violated FDCPA 15 U.S.C. § 1692e(14)

As discussed *supra* Chase used a false name. "Although the FDCPA does not say 'what a `true name' is, its import is straightforward: A debt collector may not lie about his institutional affiliation.'" *Sheriff v. Gillie*, No. 15-338 (U.S. May 16, 2016)(internal citation omitted). Use of a false name is a per se violation of the Act. 15 U.S.C. § 1692e(14). The present owner of the debt must be identified in a reasonable manner. *Luzinski v. Arrow Financial Services, LLC*, 05-CV-1322, 2007 U.S. Dist. LEXIS 71788 (E.D.Wisc. Sept. 26, 2007). Whether a particular communication is false or deceptive is a question for the jury. *Jeter*, 760 F.2d at 1178. Plaintiff does not have to allege harm or actual confusion — the FDCPA is a "strict liability statute." *Fed. Home Loan Mortg. Corp. v. Lamar*, 503 F.3d 504, 513 (6th Cir.2007). A debt collector violates § 1692e, put simply, if the collection practice that he uses has the tendency to confuse the least sophisticated consumer. *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 329 (6th Cir.2006).

### Chase Violated FDCPA 15 U.S.C. § 1692e(10)

15 U.S.C. § 1692e(10) prohibits the use of fictitious or misleading names (such as the use of a collection agency name by a creditor or use of an attorney's letterhead by a collector). *Hepsen v. J.C. Christensen & Assocs., Inc.*, 2009 WL 3064865 (M.D. Fla. Sept. 22, 2009) (defendant misrepresented identity of current creditor), aff'd on other grounds, 383 Fed. Appx.

877 (11th Cir. 2010). A collector's use of a name other than the name under which it is licensed violated section 1692e(10). *See Moore v. Nat'l Account Sys., Inc.*, 1991 WL 313896 (D. Conn. Nov. 13, 1991) (magistrate's opinion). Failing to clearly identify the creditor violates § 1692e(10). *See Scheunemann v. J.C. Christensen & Assocs., Inc.*, 802 F. Supp. 2d 981 (E.D. Wis. 2011) (could not determine whether the original creditor was properly disclosed as Washington Mutual when the consumer's credit report showed Chase Bank USA as the original creditor).

### Chase Violated FDCPA 15 U.S.C. § 1692e(8)

1692e(8) prohibits a misstatement to a CRA, *Justice v. Ocwen Loan Servicing*, 2015 WL 235738 (S.D. Ohio Jan. 16, 2015) (denied summary judgment for the mortgage servicer on the homeowners' claim under § 1692e(8) that it was falsely reporting the account).

§ 1692e(8) recognizes that reporting a debt to a credit bureau is "a powerful tool designed, in part, to pressure consumers to keep to the payment terms of all of their obligations." *See Rivera v. Bank One,* 145 F.R.D. 614, 623 (D. P.R. 1993) ("A Bank Card issuer's ability to report on the credit habits of its customers is powerful tool designed, in part, to wrench compliance with payment terms from its cardholder. Bank One's alleged refusal to correct mistaken information can only be seen as an attempt to tighten the screws on a non-paying customer."); *Koller v. West Bay Acquisitions, L.L.C.*, 2012 WL 1189481, at *5 (N.D. Cal. Apr. 9, 2012) ("credit reporting is one of the most commonly taken steps in debt collection efforts").

The reporting of a debt to a CRA by a debt collector is a communication to which the FDCPA applies. *Akalwadi v. Risk Mgmt. Alternatives, Inc.*, 336 F. Supp. 2d 492, 503 n.4 (D. Md. 2004) ("act of a debt collector reporting the status of a consumer debt to a credit reporting agency is an activity that would certainly appear to meet the statute's requirement that the false, deceptive, or misleading representation or means be 'in connection with' the collection of a debt"). In *Nelson v. Equifax Info. Servs., L.L.C.* 522 F. Supp. 2d 1222 (C.D. Cal. 2007), Reporting a debt that was not owed and disputed to a CRA resulted in $85,000 of damages for emotional distress.

### Defendant Proffers FDCPA Cases Not Analogous To The Instant Case

Chase cites *Alhassid v. Bank of America, N.A.*, 60 F. Supp. 3d 1302, 1325 (S.D. Fla. 2014) was a class action wherein Plaintiffs sued their loan servicers under FDCPA for inflated fees,

civil conspiracy and other counts, and is therefore not analogous to the instant action and should be disregarded by the court as the citation has no authority. Pinson is not suing Chase as servicer.

Chase cites *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985) wherein the Court notes "The creative efforts of plaintiff Robert Perry, a lawyer, and the intransigence of ten defendants turned this relatively simple breach of contract/tort case involving the sale of a residence into a enormously expensive brouhaha for all of the parties." The case involved counts included Recession, Usury, Breach of Warranty, TILA and there was a cross appeal. Perry sued his servicer for FDCPA, and is therefore not analogous to the instant action and should be disregarded by the court as the citation has no authority. Pinson is not suing Chase as servicer.

Chase cites *Reese v. JPMorgan Chase & Co.*, 686 F. Supp. 2d 1291, 1311 (S.D. Fla. 2009) wherein Plaintiff sued with Counts include TILA, Rescission, Fraud in the Inducement; RESPA as well as FDCPA and FCCPA. Apparently two competing lenders talked her into taking out back to back mortgages. Her FDCPA count was filed untimely and is therefore not analogous to the instant action and should be disregarded by the court as the citation has no authority. Pinson filed his complaint within the one year statute of limitations and is not suing Chase as servicer.

Chase cites *Monroe v. CitiMortgage, Inc.*, 2007 U.S. Dist. LEXIS 38624 (M.D. Fla. 2007) wherein Plaintiff faced Rooker-Feldman for his post foreclosure action and is therefore not analogous to the instant action and should be disregarded by the court as the citation has no authority. Pinson has sufficiently alleged Chase is a debt collector as discussed supra.

### Chase's Arguments Against FDCPA Counts I & II Fail

Because Chase failed to properly address the nucleus of operative facts pled in Pinson's complaint under FDCPA, its motion to dismiss the FDCPA counts I & II must be denied.

### The FCRA Generally

The Fair Credit Reporting Act was enacted to protect consumers/plaintiffs from the consumer reporting agencies/furnishers/users/defendants, not vice-versa. The FCRA is supposed to receive a liberal construction in favor of consumers, not in favor of the credit and credit reporting industries. *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329 (9th Cir. 1995) (Cal.); *Klapper v. Shapiro*, 586 N.Y. S.2d 846 (N.Y. Sup. 1992); *Kates v. Croker Nat. Bank*, 776 F.2d 1396, 1397 (9th Cir. 1995); *Litschitz v. American Express Co.*, 560 F. Supp. 458 (U.S.D.C. Pa. 1983); *Jones v. Federated Fin. Res. Corp.*, 144 F.3d 961 (6th Cir. 1998) (Mich.).

### Pinson's Complaint Satisfies Minimum Pleading Requirements

Creditors, debt collectors, and others who furnish information to CRAs must participate in reinvestigations conducted by the CRAs when consumers dispute the accuracy or completeness of information with the CRA, and must follow certain steps to correct erroneous information. 15 U.S.C. § 1681s-2(b). There is a FCRA private right of action to sue creditors and other furnishers who fail to comply with these requirements.

This private right of action is only triggered where a CRA asks the furnisher to reinvestigate, and not where a consumer disputes the information directly with the furnisher.

Two mistaken decisions, which grow increasingly isolated with each new opinion upholding private actions, have misconstrued the provision as only allowing CRAs—and not consumers—to bring civil actions. *Zamos v. Asset Acceptance, L.L.C.*, 423 F. Supp. 2d 777 (N.D. Ohio 2006); *Carney v. Experian Info. Solutions, Inc.*, 57 F. Supp. 2d 496 (W.D. Tenn. 1999). To avoid any mistake, Pinson's complaint only shows a claims for FCRA § 1681s-2(b) violations - the record shows § 1681s-2(a) is not found in Pinson's complaint. *Oganyan v. Square Two Fin.*, 2012 WL 3656355 (C.D. Cal. Aug. 24, 2012) (pro se litigant pleaded elements of violation of § 1681s-2(b), but court mistakenly dismissed her FCRA claim based on the lack of a private right of action to enforce § 1681s-2(a)).

"On or about June 10, 2014 the Plaintiff disputed the reporting of the Chase Home Finance LLC trade line to TransUnion" *Compl.* 51. clearly indicating than 30 days passed before Pinson filed his complaint.

When a furnisher receives notice of a dispute from a CRA, the furnisher must conduct a timely investigation of the disputed information, review all relevant information provided by the CRA, and report the results of the investigation to the CRA. If the investigation reveals that the original information is incomplete or inaccurate, the furnisher must report the results to all other CRAs to which it supplied such information. 15 U.S.C. §§ 1681s-2(b)(1), 1681s-2(b)(2).

The reasonableness of a reinvestigation will depend on the circumstances and will often be a question for the trier of fact. *See, e.g., Modica v. Am. Suzuki Fin. Serv. Co.*, 2013 WL 656495 (D. Ariz. Feb. 22, 2013) (summary judgment not appropriate on question of whether investigation was reasonable); *Dickman v. Verizon Commc'ns, Inc.*, 876 F. Supp. 2d 166, 174 (E.D.N.Y. 2012) (extensive discussion of disputed facts; summary judgment not appropriate where questions of fact exist as to timeliness and reasonableness of investigation). Reporting inconsistent results and remedial instructions to different CRAs indicates negligence. *Alston v. Wells Fargo Bank*, 2013

WL 990416 (D. Md. Mar. 12, 2013). Where a consumer has continued to dispute an item, a furnisher who fails to attempt to correct the inaccurate information by electronic Automated Consumer Dispute Verification (ACDV), may be negligent. *Evantash v. G.E. Capital Mortg. Serv., Inc.*, 2003 WL 22844198 (E.D. Pa. Nov. 25, 2003).

At the pleading stage, Pinson has sufficiently alleged actual damages to place Chase on notice. *Bach v. First Union Nat'l Bank*, 149 Fed. Appx. 354, 361 (6th Cir. Aug. 22, 2005) (affirming award of compensatory damages based on violation of section 1681s-2(b); rejecting furnisher's argument that the plaintiff's testimony as to damages was insufficient to impose liability).

One week ago, the 11th Circuit published a 26 page opinion in *Hinkle v. Midland Credit Management, Inc.*, No. 15-10398 (11th Cir. July 11, 2016) issued after oral argument before the panel. Ms. Hinkle, who proceeded *pro se* in the district court was represented by Craig Perry, Esq. in her appeal. The court noted "[t]he scope of the duty to investigate under § 1681s-2(b) is an issue of first impression in the Eleventh Circuit." *Id*. The 11th reversed and remanded Ms. Hinkle's 15 U.S.C. § 1681s-2(b)(2) and provided a thorough analysis of the issue. In light of this recent 11th Cir. ruling of first impression on the same § 1681s-2(b)(2) claim Pinson makes, he appends a copy of *Hinkle v. Midland* to this opposition for the courts reference.

### Chase's Arguments Against FCRA Counts III Fails

Because Chase failed to properly address the facts pled in Pinson's complaint under FCRA, its motion to dismiss the FCRA count III must be denied.

### The FCRA Does Not Preempt the Florida Law

Section 1681t(b)(1)(F) came into existence as one of the new provisions in the FCRA amendments, effective September 30, 1997. While the legislative history and testimony show that Congress did not intend to displace state tort, contract, and common law actions, this section has received limited misinterpretation in select cases. In fact, this section was only intended to displace and preempt state mini-credit reporting acts (except Massachusetts and California by specific reference) and similar statutory laws designed to address credit reporting functions which are regulated by the FCRA. Congress bought into industry argument that industry needed several years to try and attain uniformity in practice and upgrades. Industry wanted a reprieve from the many and varied state laws which had been enacted to gap-fill the many deficiencies in the FCRA, 15 U.S.C. 1681, *et. seq.*

The problem first arose in the *Carney v. Experian*[6] where the court found no private right of action under section 1681s-2(b) and further found no state law claims citing section 1681t(b)(1)(F). The Carney decision has received much due negative attention and criticism by courts and commentators and has not been followed in its holding regarding 1681s-2(b). Following *Carney v. Experian*, roughly 45 District Courts[7] and two Courts of Appeals, the Fifth and Ninth Circuits, have found a private right of action under section 1681s-2(b).[8] Unfortunately, with regard to section 1681t(b)(1)(F), another court locked onto Carney and, though unnecessary, found that section 1681t(b)(1)(F) preempted state law claims. *Quigley v. Pa. Higher Education Assistance Agency.*

Thereafter, the Eastern District of Pennsylvania, in *Jaramillo v. Experian* faced the issue and the court initially accepted the defendant's position and found that two prior courts accepted the preemption argument. The court dismissed plaintiff's state law claims.[9] Plaintiff moved for reconsideration and further briefing occurred, which included the arguments made by plaintiff herein. The Judge reversed himself though, oddly, the Federal Supplement Reporter system did not report the reversal and has left the reversed ruling on the books.[10] The court reinstated plaintiff's state law claims which had been rejected under section 1681t(b)(1)(F).

While courts have described the FCRA as "no model of clarity"[11] it seems that section 1681t exceeds the prior benchmark of confusion. Beginning in 1999, there was a second line of cases which began reporting in stark contrast to *Carney v. Experian, supra.* The second line of cases help that section 1681t was nothing more than a provision to preempt state mini-credit

---

[6] 57 F. Supp.2d 496 (U.S.D.C. W.D. Tenn. 1999).

[7] *See, e.g., Johnson v. USA, DOD*, 2000 U.S.Dist. Lexis 21087, cause no. CV99-1699 (U.S.D.C. Minn. 2000); *Whitesides v. Equifax Credit Information Services, et al*, 125 F. Supp.2d 807 and 125 F. Supp.2d 813 (U.S.D.C. W.D. La. 2000); *Campbell v. Baldwin*, 90 F. Supp.2d 754, 756 (U.S.D.C. E.D. Tex. 2000); *Bruce v. First USA Bank*, 103 F. Supp.2d 1135  (U.S.D.C. E.D. Mo. 2000); *DiMezza v. First USA Bank*, 103 F. Supp.2d 1296, 1300 (U.S.D.C. N.M. 2000); *Mandly v. Bank One Dayton*, 2000 U.S.Dist.Lexis 16268 (U.S.D.C. Ariz. 2000); *Dornhecker v. Ameritech Corp.*, 99 F. Supp.2d 918, 927 (U.S.D.C. N.D. Ill. 2000); *Thomasson v. Bank One, Louisiana, N.A.*, 137 F. Supp.2d 721 (U.S.D.C. E.D. La. 2001); *McMillan v. Experian*, 119 F. Supp.2d 84, 88 (U.S.D.C. Conn. 2000); *Olexy v. Interstate Assur. Co.*, 113 F. Supp.2d 1045, 1047-48 (U.S.D.C. S.D. Miss. 2000); *Ryan v. Trans Union Corp.*, 2000 Westlaw 1100440 (U.S.D.C. N.D. Ill. 2000); *Banks v. Stoneybrook Apartment*, 2000 Westlaw 1682979 (U.S.D.C. M.D. N.C. 2000); *Brown v. Maine Medical Center*, 1999 Westlaw 33117137 (U.S.D.C. Me. 1999); *Geeslin v. Nissan Motor Acceptance Corp.*, 1998 Westlaw 433932, at p.3, U.S.Dist.Lexis 11476, (U.S.D.C. N.D. Miss. 1998); *Nicholl v. NationsBank of Georgia*, 488 S.E.2d 751, at 754 (Ga. App.).

[8] The Circuit decisions: *Nelson v. Chase Manhattan Bank*, 282 F.3d 1057 (9th Cir. 2002), and *James Young v. Equifax*, 294 F.3d 631 (5th Cir. 2002). The Nelson decision was followed by another panel of the United States Ninth Circuit Court of Appeals in *Sharron v. NMAC*, 44 Fed.Appx. 157 (9th Cir. 2002)

[9] 155 F. Supp.2d 356 (U.S.D.C. E.D. Pa. 5/21/01).

[10] 2001 U.S.Dist.Lexis 10221(U.S.D.C. E.D. Pa. 6/20/01).

[11] *See, e.g., McAnly v. Middleton & Reutlinger, PSC*, 77 F. Supp.2d 810 (U.S.D.C. W.D. Ky. 1999).

reporting statutes so as to allow the industry a limited window of time to attain uniformity in its practices and avoid the patchwork of state statutes which were necessary to gap fill the FCRA's deficiencies. These courts have refused to dismiss state law and common law claims in the nature of negligent credit reporting,[12] defamation, negligent enablement of the imposter,[13] invasion of privacy, etc.[14]

The Fair Credit Reporting Act does not preempt state or common law claims as long as the state or common law is not inconsistent with the Fair Credit Reporting Act.[15] The Fair Credit Reporting Act does not preempt a state law cause of action for defendant's negligence in communicating erroneous credit data about a consumer.[16]

In further support, courts have uniformly found that the FCRA does not entirely preempt the area of credit reporting. In fact, courts have uniformly rejected creditor's and consumer reporting agencies' arguments that the FCRA bars state law claims. *See Sehl v. Safari Motor Coaches, Inc.*, 2001 U.S.Dist.Lexis 12638 (U.S.D.C. N.D. Cal. 2001)(for detailed discussion); *Harper v. TRW*, 881 F. Supp. 294 (U.S.D.C. S.D. Mich. 1995); *Rule v. Ford Receivables*, 36 F. Supp.2d 335 (U.S.D.C. S.D. Va. 1999); *Watkins v. Trans Union*, 118 F. Supp.2d 1217 (U.S.D.C. N.D. Ala. 2000); *Swecker v. Trans Union*, 31 F. Supp.2d 536 (U.S.D.C. E.D. Va. 1998); *Saia v. Universal Card Svc.*, 2000 U.S.Dist.Lexis 9494, 2000 Westlaw 863979 (U.S.D.C. E.D. La. 2000); *Sherron v. Private Issue by Discover*, 977 F. Supp.2d 804 (U.S.D.C. N.D. Miss. 1997); *Hughes v. Fidelity Bank*, 709 F. Supp.2d 639 (U.S.D.C. E.D. Pa. 1989). As succinctly stated by *Sehl v. Safari Motor Coaches, Inc.*, 2001 U.S.Dist.Lexis 12638 (U.S.D.C. N.D. Cal. 2001): "Furnishers are still subject to state statutes which are not inconsistent with the FCRA." The

---

[12] *Amber Dawn Williams v. Experian*, 2002 Westlaw 31133235 (U.S.D.C. E.D. Tex. 8/02) (Judge John Ward), which also adopted the decision in *Whitesides v. Equifax*, 125 F. Supp.2d 807, 813 (U.S.D.C W.D. La. 2000), correcting a misinterpretation of section 1681h(e). In accord: *McAnly v. Middleton & Reutlinger, P.S.C.*, 77 F. Supp. 2d 810, 814-815 (U.S.D.C. W.D. Ky. 1999); *Yeager v. TRW*, 984 F. Supp. 517, 522 (U.S.D.C. E.D. Tex. 1997).

[13] *Brown v. Bank One Corp.*, 2002 U.S. Dist. LEXIS 22692 (U.S.D.C. N.D. Ill. 2002) ("In this case, similarly, Bank One's alleged misconduct in issuing false loans in plaintiffs' names does not raise a challenge to the information supplied to consumer reporting agencies and, thus, is not regulated by the FCRA.")

[14] *Sehl v. Safari Motor Coaches, Inc.*, 2001 U.S.Dist.Lexis 12638 (U.S.D.C. N.D. Cal. 2001); *Whitesides v. Equifax*, 125 F. Supp.2d 807, 813 (U.S.D.C. E.D. Tex. 2000); *Dornhecker v. Ameritech Corp.*, 99 F. Supp.2d 918 (U.S.D.C. N.D. Ill. 2000); *McAnly, supra; Olexy v. Interstate Assur. Co.*, 113 F. Supp.2d 1045 (U.S.D.C. S.D. Miss. 2000); *Mayberry v. Ememessay, Inc.*, 201 F. Supp.2d 687 (U.S.D.C. W.D. Va. 2002); *Johnson v. Federal Express*, 147 F. Supp.2d 1268 (U.S.D.C. M.D. Ala. 2001); *Thomasson v. Bank One, Louisiana, N.A.*, 137 F. Supp.2d 721 (U.S.D.C. E.D. La. 2001); *Amber Dawn Williams, supra* note 7.

[15] *See, e.g., Credit Data of Arizona, Inc. v. State of Arizona*, 602 F.2d 195 (C.A. Ariz. 1979).

[16] *Hughes v. Fidelity Bank*, 709 F. Supp. 639 (U.S.D.C. E.D. Pa. 1989); *Equifax Services, Inc. v. Cohen*, 420 A.2d 189 (Me. 1980), cert. denied, 450 U.S. 916 (1981).

FCRA has not completely preempted the area.

Other Court decisions have found the Fair Credit Reporting Act to be the exclusive remedy only if there is no state statute or common law rights or cause of action. *See*, for example, *Matthews v. GEICO*, 23 F. Supp.2d 1160 (U.S.D.C. S.D. Cal. 1998). The state law claims asserted by plaintiff herein supplement and are not inconsistent (and are consistent) with the express purposes of the Fair Credit Reporting Act. *Retail Credit Co. v. Dade County*, 393 F. Supp. 577 (U.S.D.C. S.D. Fla. 1975); S.Rep.No. 517, 91st Congress 1st Session 8 (November 5, 1969) (". . .No state law would be preempted unless compliance would involve a violation of federal law.")

Yet, despite the weight of authority rejecting defendant Chases's position of preemption of all claims, a couple of courts have chosen to follow the ill founded Carney trail.[17] The misinterpretation of section 1681t(b)(1)(F) adopted by the defense is contrary to the plain language of the section.

### Chase's Arguments for FCRA Preemption Fails

Because Chase failed to properly address the facts pled in Pinson's complaint under FCRA, its motion to dismiss the state law claims under FCRA preemption must be denied.

### False Light can be re-pled as Defamation by Implication (V)

By separate notice to the Court, Pinson, pursuant to 42(a)(2) of the Federal Rules of Civil Procedure voluntarily dismisses this count without prejudice.

### Pinson meets pleading standard for Negligent Training & Supervision (VI)

As discussed supra, Pinson's notice pleading meets pleading standards for Negligent Training & Supervision (VI). As such, Chase's argument fails.

This count could be re-pled as two separate counts if the court deems necessary in the interest of justice, and grants Pinson leave and sufficient time to amend his complaint.

### Reckless and Wanton Training and Supervision (VII)

By separate notice to the Court, Pinson, pursuant to 42(a)(2) of the Federal Rules of Civil Procedure voluntarily dismisses this count without prejudice.

### § 1692b(f) (VIII) and § 1692q (IX)

---

[17] *Aklagi v. NationsCredit Financial Services Corp.*, 196 F. Supp.2d 1186 (U.S.D.C. Kan. 2002) (Court tried to coin section 1681t as an "absolute immunity" provision); *Hasvold v. First USA Bank, N.A.*, 194 F. Supp.2d 1228 (U.S.D.C. Wyo. 2002); and *Vasquez-Garcia v. Trans Union de Puerto Rico*, 2002 Westlaw 31094882 (U.S.D.C. P.R. 2002).

Chase makes the same arguments to FCRA counts XIII & IX, and Pinson addresses in turn.

### 1. During Civil Litigation it is Impermissible to Obtain a Consumer Report

There is no exclusive list of impermissible uses. Instead, there are only limited permissible uses, and any other uses are impermissible.

Generally, a party involved or potentially involved in litigation does not have a permissible purpose to receive a consumer report. FTC Staff Summary § 604(a)(3)(F) item 4A. *See* Press Release, Office of New York Attorney General Andrew Cuomo, Attorney General Cuomo Obtains Compensation for New Yorkers Whose Credit Reports Were Accessed Illegally (Mar. 7, 2007) (announcing settlement against insurance company that unlawfully access reports used in investigating matrimonial matters, insurance claims, and civil litigation), available at www.ag.ny.gov. For example, there is no permissible purpose to obtain a consumer report in tort litigation. FTC Staff Summary § 604(a)(3)(F) item 4B. *See also* Jerison, FTC Informal Staff Opinion Letter (Dec. 12, 1988). Litigation between two parties is not considered itself a business transaction. *See Bakker v. McKinnon*, 152 F.3d 1007 (8th Cir. 1998); *Duncan v. Handmaker*, 149 F.3d 424 (6th Cir. 1998); *Comeaux v. Brown & Williamson Tobacco Co.*, 915 F.2d 1264 (9th Cir. 1990).

If a debtor sues the creditor for violation of a federal or state consumer statute, the creditor would not have a permissible purpose for obtaining a consumer report on the plaintiff. *See Slack v. Suburban Propane Partners, L.P.*, 2010 WL 5392845 (D.N.J. Dec. 22, 2010) (allegations that defendant obtained a consumer report one day after plaintiff filed suit against defendant survive motion to dismiss); *Hinton v. USA Funds*, 2005 WL 730963 (N.D. Ill. Mar. 30, 2005) (guarantor of student loan account that was fully paid but still reported as delinquent did not have permissible purpose to access plaintiff's account to assess validity of plaintiff's FCRA claim against creditor). As such, Chase's argument fails.

### Chase's "Natural Person" Argument is Premised on a Fabricated Citation[18] and Fails

---

[18] In footnote 2 of its MTD, "Chase submits sanctions under Fed. R. Civ. P. 11 are appropriate". Pinson has completely addressed *supra* how as pled his complaint statutorily alleges Chase as a "debt collector" under 15 U.S.C. § 1692a(6)'s "false names" sentence. Pinson notes, Chase failed to provide him with the required 21 day advanced safe harbor notice under Rule 11. Pinson also recognizes Rule 11 swings both way, and additionally the Court has an inherent power to sanction.

Here, it appears patently deceptive to Pinson where Chase puts forward what is unquestionably false statement of fact or law before this tribunal to make it's argument. Pinson appends a true and correct copy from Westlaw of the citation referenced to evidence the correct citation and context. *Hunt v. Experian Info. Solutions*, 2006 U.S. Dist. LEXIS 62516 (D. Neb. 2006). Though another court may have ruled based on the false citation, it does not change the facts surrounding the original. This Court has an inherent power to sanction.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter an order denying Defendant Chase's Motion to Dismiss [DE 14] Pursuant to FRCP 12(b)(6); and any other relief as deemed equitable and just. In the alternative, if the Court determines Plaintiff has failed to state a claim, Plaintiff asks the Court to grant leave and sufficient time to amend his complaint; and any other relief as deemed equitable and just.

Dated: July 18, 2016

Respectfully Submitted,

John Pinson
526 Westwood Road
West Palm Beach, Florida 33401
561-833-4816
john@pinson.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed with the Clerk of the Court, and is served by CM/ECF upon entry into the docket on all counsel, by the mandatory CM/ECF system, on the Service List below.

Signed July 18, 2016

John Pinson

### Service List

Brendan I. Herbert, Esq.
Leon Cosgrove LLC
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134

*[Handwritten notes:]* Attached for Reference only: 28 Pages
- Hunt v. Experian, 2M.
- Hinkle v. Midland 268
  28

2006 WL 2528531
Only the Westlaw citation is currently available.
United States District Court,
D. Nebraska.

Terri HUNT, Plaintiff,
v.
EXPERIAN INFORMATION SOLUTIONS,
Defendant.

No. 8:05CV58.
|
Aug. 31, 2006.

### Attorneys and Law Firms

Pamela A. Car, William L. Reinbrecht, Car, Reinbrecht Law Firm, Omaha, NE, for Plaintiff.

Brad A. Sobolewski, Jones, Day Law Firm, Cleveland, OH, William J. Birkel, McGrath, North Law Firm, Omaha, NE, for Defendant.

### MEMORANDUM AND ORDER

JOSEPH F. BATAILLON, Chief District Judge.

**\*1** This is an action for damages under the Fair Credit Reporting Act, 15 U.S.C. § 1681a *et seq.* In her Complaint, plaintiff alleges that defendant Experian Information Systems, Inc. ("Experian"), violated the Fair Credit Reporting Act by reporting inaccurate information and failing to properly reinvestigate plaintiff's dispute of the information.

Defendant moves for summary judgment in its favor. It asserts that the FCRA does not afford relief where a consumer entered transactions for business or commercial purposes. Defendant further alleges that the undisputed evidence shows that plaintiff cannot show that defendant's actions caused her damages.

There is no dispute that defendant is a credit reporting agency covered by the Act. 15 U.S.C. § 1681 a(f). There is similarly no dispute that the report maintained by defendant on plaintiff was a report maintained on plaintiff in her individual capacity and was not a commercial credit report. Also, it is undisputed that plaintiff applied

for credit in her individual capacity. The evidence also shows that plaintiff owns four houses and leases them to tenants.

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Harder v. ACANDS,* Inc., 179 F.3d 609, 611 (8th Cir.1999). Once a party has filed a motion for summary judgment, the burden shifts to the nonmoving party to "go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.' " *Planned Parenthood of Minnesota/South Dakota v. Rounds,* 372 F.3d 969, 972 (8th Cir.2004) (quoting *Commercial Union Ins. Co. v. Schmidt,* 967 F.2d 270, 271 (8th Cir.1992)). A dispute is genuine if the evidence is such that a reasonable trier of fact could return a decision in favor of the party opposing summary judgment. *Id.* In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations. *Kenney v. Swift Transp. Co.,* 347 F.3d 1041, 1044 (8th Cir.2003). Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *Koehn v. Indian Hills Community College,* 371 F.3d 394, 396 (8th Cir.2004).

The FCRA applies to consumers, defined to mean "individuals." 15 U.S.C. § 1681 a(c). Consumer report means:

any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected ... for the purpose of serving as a factor in establishing the consumer's eligibility for

(1) credit or insurance to be used primarily for personal, family, or household purposes, or

**\*2** (2) employment purposes, or

(3) other purposes authorized under Section 1681 b of this title.

15 U.S.C. § 1681 a(d)(1). "Consumer" includes only natural persons, and does not include partnerships, corporations, trusts, estates coops, associations or government entities. *See* 16 C.F.R. 600, App. § 603(a). A report is a "consumer report" if (1) person who requests it

1/26

actually uses it for one of the statutory purposes, or (2) the agency preparing the report expects it to be used for one of the consumer purposes, or (3) the agency which prepared the report originally collected the information expecting it to be used for one of the consumer purposes. *Ippolito v. WNS,* Inc. 864 F.2d 440, 449 (7th Cir.1988).

Under the FCRA, "whether a credit report is a consumer report does not depend solely upon the ultimate use to which the information contained therein is put, but instead, it is governed by the purpose for which the information was originally collected in whole or in part by the consumer reporting agency." *Bakker v. McKinnon,* 152 F.3d 1007, 1012 (8th Cir.2002); *Phillips v. Grendahl,* 312 F.3d 357, 366 (8th Cir.2002) (finding report a consumer report because it was prepared with expectation it would be used for a statutory purpose); *St. Paul Guardian Insurance Co. v. Johnson,* 884 F.2d 881, 883 (5th Cir.1989) (purpose for which information is collected, rather than use to which it is put, governs whether it is a "consumer report"); *Comeaux v. Brown & Williamson Tobacco Co.* 915 F.2d 1264, 1274 (9th Cir.1990) (if a report is provided on reasonable expectation that it will be put to a permissible use under the Act, then it is a "consumer report" and the ultimate use to which it is actually put is irrelevant). Punitive damages as well as actual damages for emotional distress are recoverable under the FCRA. *Phillips,* 312 F.3d at 369; *Millstone v. O'Hanlon Reports, Inc.,* 528 F.2d 829, 834 (8th Cir.1976) (affirming an award of punitive damages on evidence that the defendant "trampled recklessly" on the plaintiff's rights).

The court finds that there is no merit to defendant's contention that plaintiff is not covered under the FCRA because she is engaged in a commercial enterprise. There is no evidence that plaintiff has, or is part of, any type of company, trust, partnership, corporation or other business entity in connection with her rental property. Similarly, there is no evidence that defendant collected the information for any other purpose than those set out in the FCRA, that is, to establish Hunt's eligibility for personal credit or insurance, employment, licensing or other permissible purpose under the Act. Cases to the contrary

are inapposite; they deal with the extension of commercial credit. *See, e.g., Yeager v. TRW, Inc .,* 961 F.Supp. 161, 163 (E.D.Tex.1997) (report issued in response to application for commercial credit); *Wrigley v. Dun & Bradstreet,* 375 F.Supp. 969, 970–71 (N.D.Ga.1974), *aff'd,* 500 F.2d 1183 (5th Cir.1974) (credit report issued on owner of construction company for purpose of extending commercial credit to the company was not covered by the F.C.R.A.); *Sizemore v. Bambi Leasing Corp.,* 360 F.Supp. 252, 254 (N.D.Ga.1973) (FCRA inapplicable to individual denied credit to lease truck for commercial use); *Fernandez v. Retail Credit Co.,* 349 F.Supp. 652, 655 (E.D.La.1972) (report relating to corporate president's application for life insurance not a consumer report where corporation was the sole beneficiary and insurance was necessary for the business to secure a loan, although court stated result might have been different if president's family had been co-beneficiary on the policy).

**\*3** The evidence shows that plaintiff's allegations all relate to credit applied for by plaintiff in her personal capacity. It would have been extended to plaintiff personally, and in reliance on her personal credit report. Plaintiff has also presented evidence that shows that there are genuine issues of material fact with respect to defendant's other assertions. Whether or not defendant employed reasonable procedures to maintain accuracy and prevent error or to conduct reasonable investigations of disputed information is a question of fact. Similarly, whether Experian's action would warrant punitive damages is a question of fact. Accordingly, the defendant's motion for summary judgment will be denied.

IT IS ORDERED that defendant's motion for summary judgment (Filing No. 75) is denied.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2528531

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-10398

_____

D.C. Docket No. 3:13-cv-00033-DHB-BKE

TERI LYNN HINKLE,

Plaintiff – Appellant,

versus

MIDLAND CREDIT MANAGEMENT, INC.,
MIDLAND FUNDING, L.L.C.,
ENCORE CAPITAL GROUP, INC.,

Defendants – Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(July 11, 2016)

Before HULL and BLACK, Circuit Judges, and MORENO,[*] District Judge.

_____

[*] Honorable Federico A. Moreno, United States District Judge for the Southern District of
Florida, sitting by designation.



BLACK, Circuit Judge:

Teri Lynn Hinkle appeals the grant of summary judgment in favor of

Midland Credit Management, Inc., Midland Funding, L.L.C., and Encore Capital

Group, Inc. (collectively Midland[1]), for claims asserted by Hinkle under the Fair

Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.*, and the Fair Debt

Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq.*  Hinkle claims that

Midland erroneously attributed debts to Hinkle, reported the debts to Experian,

Equifax, and TransUnion credit reporting agencies (the CRAs), and failed to

properly verify the debts when Hinkle disputed their validity.  The district court

held that no reasonable jury could find that Midland violated the FCRA or the

FDCPA with respect to Hinkle.  We reverse and remand as to Hinkle's claims

under § 1681s-2(b) of the FCRA.  We affirm as to all other claims.[2]

## I. BACKGROUND

A consumer debt is created when an entity such as a bank, a credit card

company, or a cell phone provider (an "original creditor") extends credit to a

---

[1] Midland Credit Management and Midland Funding are wholly-owned subsidiaries of Encore Capital Group.  Midland Funding is a debt buyer that purchases charged-off debt accounts.  Midland Credit Management is a debt collector that specializes in servicing debt accounts purchased by Midland Funding.

[2] We conclude that all other claims, including but not limited to claims under § 1681b of the FCRA and §§ 1692d, 1692e, and 1692g of the FDCPA, are dismissed, waived, abandoned, or lack merit.  The undisputed facts of this case are sufficient to resolve the controlling issues on appeal.  We therefore make no determination as to whether the district court erred in admitting the affidavit of Angelique Ross to authenticate documents Midland relied on at summary judgment.



consumer.  The consumer must then make payments on the debt in accordance with the terms of her contract with the original creditor.  *See* Federal Trade Commission, *The Structure and Practices of the Debt Buying Industry*, 2013 WL 419348, at *10 (Jan. 2013) (hereinafter "FTC Report").  Should a consumer fall behind on her payments, the original creditor will eventually be entitled to "charge off" the debt as severely delinquent.  *See id.* at *12.  Charged-off debt is deemed uncollectable and treated as a loss for accounting purposes.  *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1188 n.5 (11th Cir. 2010).  But charging off a debt does not diminish the legal right of the original creditor to collect the full amount of the debt.  *See id.* ("[C]harged off debt is not forgiven."); FTC Report, 2013 WL 419348, at *14 (describing measures taken by original creditors to collect charged-off debts).

     Once a debt has been charged off, there are two ways an original creditor can recoup its losses.  First, the original creditor may continue attempting to collect the debt itself—either by utilizing internal collections staff, *see* FTC Report, 2013 WL 419348, at *14, or by contracting with a third-party agent (a "collection agency") willing to collect the debt on behalf of the original creditor, *see, e.g.*, *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 826 (7th Cir. 2005). Alternatively, the original creditor may choose to sell the debt to a third-party purchaser (a "debt buyer") at a discounted price based on the reduced likelihood of

5/28

collection. FTC Report, 2013 WL 419348, at *18. When an original creditor sells a debt, the original creditor relinquishes its right to collect the debt and transfers that right to the debt buyer. *See id.* at *11-14. This allows the original creditor to wash its hands of the debt while still recouping a fraction of its losses on the secondary debt market. *Id.* at *11.

The buyer of a debt on the secondary debt market enjoys essentially the same prerogatives as did the original creditor. The debt buyer may attempt to collect the debt itself—internally, or by hiring a collection agency—or the debt buyer may resell the debt to another debt buyer. *Id.* When the initial buyer of a debt is unable to collect, the buyer can recoup a fraction of its losses by including the debt in a portfolio of uncollected debts and selling it down the line to another debt buyer (a "down-the-line buyer") at an even deeper discount. *See id.* at *3, *15. The down-the-line buyer can, in turn, choose whether to engage in collection activities or to sell the debt further down the line. *Id.* at *15. Debts that have been repeatedly bought and sold in this manner are sometimes referred to as "junk debts." *See, e.g., Osinubepi-Alao v. Plainview Fin. Servs., Ltd.*, 44 F. Supp. 3d 84, 87 (D.D.C. 2014); *Bodur v. Palisades Collection, LLC*, 829 F. Supp. 2d 246, 255 (S.D.N.Y. 2011). They are often sold "as is," in the form of electronic data, and without "account-level documentation" such as applications, agreements, billing statements, promissory notes, notices, correspondence, payment checks, payment

4

histories, or other evidence of indebtedness.[3]  FTC Report, 2013 WL 419348, at *3-4, *28-29.

This case involves two such "junk debts," the GE/Meijer and T-Mobile accounts, both of which Midland purchased "as is," without account-level documentation, after a down-the-line journey from one debt buyer to another.  On September 24, 2008, Midland acquired a debt account originating with GE/Meijer in the amount of $357.56 attributable to "Terri Hinkle."  Midland purchased this debt from AIS Services, L.L.C. (AIS), another buyer of charged-off consumer debt.  The account was sold "as is" save for a limited warranty by AIS that the information associated with the account was "materially true and accurate to the best of [AIS's] knowledge."  Midland acknowledged in the purchase agreement that the account "may be [an] unenforceable debt[] and may have little or no value."  The only documentation Midland received was a data file containing electronically-stored information about the debt such as the amount of the debt, the name of the original creditor, the charge-off date, and the personal information

---

[3] This is done to lower transaction costs and facilitate the quick sale of low-value debts. *See* FTC Report, 2013 WL 419348, at *21-22.  But the lack of account-level documentation can prevent debt buyers from litigating disputed debts on the merits. *See, e.g.*, N.C. Gen. Stat. § 58-70-115(5) (prohibiting a "debt buyer" from "bringing suit or initiating an arbitration proceeding against [a] debtor" without "reasonable verification of the amount of the debt allegedly owed by the debtor [including] a copy of the contract or other document evidencing the consumer debt"); *Henggeler v. Brumbaugh & Quandahl, P.C., LLO*, 894 F. Supp. 2d 1180, 1187 (D. Neb. 2012) (denying a motion to compel arbitration because a debt buyer failed to demonstrate that "a valid agreement to arbitrate exists" and "submitted only a generic cardmember agreement from Chase Bank" that was "unsigned").

7/28

associated with the debt.  Although Midland did not receive any account-level documentation, the purchase agreement required AIS to assist Midland in acquiring documentation from the original creditor if necessary to respond to consumer disputes.[4]

A week after acquiring the GE/Meijer account, Midland sent a collection letter to the address on file stating that the current balance of the debt was $395.81 and offering to settle the debt for $237.49.  On October 13, 2008, Midland received a payment for the settlement amount.  The record does not reflect who made this payment.  On November 17 and December 15, 2008, Midland reported to the CRAs that the debt belonged to Hinkle and was "assigned to internal or external collections."  On December 22, 2008, Midland zeroed out the account and marked it paid in full.  Midland reported the account to the CRAs as "paid in full" in January, February, and March of 2009.  Thereafter, Midland ceased reporting the account.  The CRAs marked the account "paid" but continued to show that it had been in "[c]ollection as of Dec 2008, Nov 2008."

Hinkle claims that she did not pay the GE/Meijer debt and in fact did not receive any correspondence from Midland regarding the GE/Meijer account.

---

[4] The purchase agreement requires AIS to contact the original creditor upon Midland's written request and, to the extent account-level documentation is "reasonably available and provided to [AIS]," provide copies to Midland.  The purchase agreement specifically permits Midland to invoke this right "after the Closing Date . . . in order to respond to [consumer] inquiri[es]."

Hinkle became aware of the GE/Meijer account in May 2011, when she obtained her credit report and discovered that Midland had erroneously attributed the account to her.  On September 6, 2011, Hinkle filed a dispute with the CRAs explaining that the GE/Meijer account did not belong to her.  The CRAs notified Midland of the dispute, stating:  "Consumer states inaccurate information" and "[c]laims true identity fraud, account fraudulently opened."  The CRAs instructed Midland to "Verify Name, address, SSN, Dates and Balance."  Additionally, on October 20, 2011, Hinkle sent Midland a written "Demand for Validation of Debt," reiterating that she had never had an account with GE/Meijer.  Midland did not take action on Hinkle's dispute because it had already marked the account paid and ceased to report it to the CRAs.

On December 6, 2011, Midland acquired a debt originating with T-Mobile in the amount of $300.80 attributable to "Teri Hinkle."  Midland purchased this debt from Debt Recovery Solutions, L.L.C. (DRS), also a buyer of charged-off consumer debt.  Like the GE/Meijer account, the T-Mobile account was sold with limited warranties as to its accuracy or collectability.[5]  The only documentation Midland received was a data file containing electronically-stored information about the debt.  Also like the GE/Meijer account, the T-Mobile account was sold without

---

[5] DRS warranted "[t]o the best of [its] knowledge" that the information associated with the account was "true, complete, accurate and not misleading."  The purchase agreement also contains a warranty that the information DRS was providing to Midland consisted of "[DRS's] own business records regarding the Accounts."

7

any account-level documentation.  The purchase agreement required Midland to

obtain "express written authorization" from DRS before requesting account-level

documentation from the original creditor.  DRS promised to "act on behalf of

[Midland] as an intermediary" between Midland and the original creditor to

investigate inquiries regarding the T-Mobile account, but the parties disagree

regarding whether the purchase agreement permits Midland to invoke that promise

after closing.

On December 21, 2011, Midland sent a collection letter to Hinkle offering a

10% discount to resolve the debt.  On December 28, 2011, Midland called Hinkle

in an attempt to reach settlement.  Hinkle orally disputed the debt, informing

Midland that the account did not belong to her.  Midland recorded the dispute as

"FRAUD/ID THEFT . . . CONSUMER SAID THAT SHE DOESN'T OWE

THAT BILL."

On February 5, 2012, Midland sent Hinkle a letter advising her that it was

investigating her dispute and telling her that "[a]s part of our investigation . . . it

would be helpful to have a copy of any documentation you may have that supports

your dispute."  Apart from this letter, however, Midland did not take action on the

December 28, 2011, dispute.  Internal Midland records note that, notwithstanding

its disputed status, Hinkle's account was "OK to work" because the dispute was



"outside validation period. Consumer needs to send proof."[6] In February 2012,

Midland began reporting to the CRAs that the debt was "assigned to internal or

external collections." When Midland made these reports, it flagged the debt as

"[d]isputed." On July 5, 2012, Hinkle obtained a copy of her credit report

reflecting these designations.

On July 13, 2012, Hinkle disputed the T-Mobile account with the CRAs.

The CRAs notified Midland of the dispute on July 20, 2012. Midland was advised:

"Dispute Type 1-Not his/hers. Verify Name, address, SSN, Dates and Balance."

Upon receipt of this request, Midland verified the debt by double-checking the

information it had reported to the CRAs against its own internal records. These

records consisted of the same electronically-stored information Midland received

from DRS when it purchased the debt. Midland did not request account-level

documentation from DRS or T-Mobile.

On July 21, 2012, Midland sent Hinkle another letter asking her to provide

documentation supporting her dispute. Hinkle responded to Midland on July 26,

2012, reiterating that neither the T-Mobile account nor the GE/Meijer account

belonged to her and requesting validation of "ANY ALLEGED ACCOUNT WITH

Teri Lynn Hinkle." She told Midland that she could not furnish Midland with

---

[6] The phrase "validation period" is a reference to § 1692g of the FDCPA, which requires a debt collector to validate a debt when a consumer disputes the debt in writing within a certain period of time. 15 U.S.C. § 1692g(b).

"ANYTHING" because "I do not have that alleged account." Hinkle also advised Midland that she intended to sue Midland for violations of the FCRA and FDCPA. Midland continued to report the T-Mobile debt as "assigned to internal or external collections" through March 2013.

Proceeding *pro se*, Hinkle filed this lawsuit on April 30, 2013. During discovery, Hinkle requested documents and written discovery responses from Midland, but she did not take any depositions. The trial court advised Hinkle that she should seriously consider "tak[ing] some depositions," but Hinkle chose not to do so. At the close of discovery, Midland filed a motion for summary judgment relying on the documents it produced to Hinkle during discovery. The district court granted the motion and entered judgment in favor of Midland on all counts. Hinkle appeals.

## II. STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*, "viewing all facts and reasonable inferences in the light most favorable to the nonmoving party." *Jurich v. Compass Marine, Inc.*, 764 F.3d 1302, 1304 (11th Cir. 2014). "Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.* "[T]he dispute about a material fact is 'genuine' . . . if the evidence is



such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

## III. DISCUSSION

Hinkle argues on appeal that the district court erred in granting summary

judgment in favor of Midland on her claim that Midland violated § 1681s-2(b) of

the FCRA. The FCRA requires CRAs and entities that furnish information to

CRAs ("furnishers" or "furnishers of information") to investigate disputed

information. When a consumer disputes information with a CRA, the CRA must

"conduct a reasonable reinvestigation to determine whether the disputed

information is inaccurate." 15 U.S.C. § 1681i(a)(1)(A). As part of this

investigation, the CRA is required to notify the person or entity that furnished the

information that the information has been disputed. *Id.* § 1681i(a)(2). Upon

receipt of this notice, the furnisher of information must: (1) "conduct an

investigation with respect to the disputed information"; (2) "review all relevant

information provided by the [CRA]" in connection with the dispute; and (3)

"report the results of the investigation to the [CRA]." *Id.* § 1681s-2(b)(1). Should

the investigation determine that the disputed information is "inaccurate or

incomplete or cannot be verified," the furnisher must "as appropriate, based on the

results of the reinvestigation promptly . . . modify[,] . . . delete [or] permanently

block the reporting" of that information to CRAs. *Id.* § 1681s-2(b)(1)(E). The

11



CRAs must also delete or modify the information based on the results of reinvestigation. *Id.* § 1681i(a)(5)(A)(i).

When the CRAs informed Midland that Hinkle disputed the GE/Meijer and T-Mobile accounts, Midland conducted an investigation that consisted—at most—of (1) double-checking the information it had reported to the CRAs against its own electronic-data files; and (2) sending Hinkle a letter telling her that "it would be helpful to have a copy of any documentation you may have that supports your dispute."[7]  The district court held that these two measures amounted to sufficient investigation under § 1681s-2(b) on the facts of this case.  Hinkle contends that § 1681s-2(b) requires down-the-line buyers to investigate mistaken-identity disputes by verifying the identity of the alleged debtor against account-level documentation (not just against electronic-data files).  She argues that because Midland failed to obtain such documentation in response to Hinkle's dispute, a reasonable jury could find that the investigation Midland conducted was insufficient to satisfy § 1681s-2(b).

---

[7] Midland suggests on appeal that it did not take action on the GE/Meijer dispute because by the time the dispute was filed in 2011 it had already marked the account paid and ceased to report it to the CRAs.  We are unaware of any provision in the FCRA that relieves furnishers of their obligations under § 1681s-2(b) once they are no longer actively reporting the disputed account.  As it makes no difference to the result, we assume for the purposes of this opinion that Midland at least reviewed its internal records when it received a dispute notice regarding the GE/Meijer account. *Cf. Perez v. Suszczynski*, 809 F.3d 1213, 1217 (11th Cir. 2016) ("[W]hat are considered the 'facts' [at summary judgment] may not turn out to be the 'actual' facts if the case goes to trial.")

The scope of the duty to investigate under § 1681s-2(b) is an issue of first impression in the Eleventh Circuit. The FCRA does not specify the nature and extent of the "investigation" a furnisher of information must conduct under § 1681s-2(b). The structure of the statute, however, suggests that the duty of a furnisher under § 1681s-2(b) is a component of the larger reinvestigation duty imposed by § 1681i(a) on CRAs themselves. *See id.* § 1681s-2(b)(2) (requiring furnishers to complete their investigation and report its results "before the expiration of the period . . . within which the [CRA] is required to" resolve the dispute). We have previously stated that § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). Given the interrelated nature of §§ 1681s-2(b) and 1681i(a), we conclude that "reasonableness" is an appropriate touchstone for evaluating investigations under § 1681s-2(b). *See Chiang v. Verizon New England, Inc.*, 595 F.3d 26, 37 (1st Cir. 2010); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009); *Westra*, 409 F.3d at 827; *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004).

We emphasize that what constitutes a "reasonable investigation" will vary depending on the circumstances of the case and whether the investigation is being conducted by a CRA under § 1681i(a), or a furnisher of information under

13

§ 1681s-2(b).  *See Chiang*, 595 F.3d at 38 ("[W]hat is a reasonable investigation by a furnisher may vary depending on the circumstances."); *Gorman*, 584 F.3d at 1160 ("[T]he reasonableness of an investigation depends on the facts of the particular case . . . .").  Whether a furnisher's investigation is reasonable will depend in part on the status of the furnisher—as an original creditor, a collection agency collecting on behalf of the original creditor, a debt buyer, or a down-the-line buyer—and on the quality of documentation available to the furnisher.  *See, e.g., Johnson*, 357 F.3d at 431 (reasoning that a jury could find a § 1681s-2(b) violation where the original creditor ended its investigation before "consult[ing] underlying documents such as account applications").  The facts of this case require us to determine whether a reasonable jury could find that Midland—a down-the-line buyer with "as is" purchase agreements and no account-level documentation—fell short of the reasonable investigation standard when it relied on internal records to verify the identity of an alleged debtor.

Section 1681s-2(b) contemplates three potential ending points to reinvestigation:  verification of accuracy, a determination of inaccuracy or incompleteness, or a determination that the information "cannot be verified."  *See* 15 U.S.C. § 1681s-2(b)(1)(E).  Midland argues that once it compared the information the CRAs possessed with its own internal records and confirmed a match, it was entitled to report the accounts as having been "verified."  Hinkle

14

argues that the records Midland possessed were insufficient to verify the accounts and that, absent additional proof, Midland should have reported the results of its reinvestigation as "cannot be verified." We agree with Hinkle that Midland is not entitled to summary judgment under § 1681s-2(b) on the facts of this case.

Our analysis begins with the plain text of § 1681s-2(b), which requires furnishers of information to either "verif[y]" disputed information by means of "investigation," or inform the CRAs that the information "cannot be verified." *Id.* As the FCRA does not define "verify" or "investigation," we must look to the ordinary meaning of those terms. *See United States v. Santos*, 553 U.S. 507, 511, 128 S.Ct. 2020, 2024 (2008)) ("When a term is undefined, we give it its ordinary meaning."); *United States v. Lopez*, 590 F.3d 1238, 1248 (11th Cir. 2009) ("To ascertain ordinary meaning, courts often turn to dictionary definitions for guidance."). The ordinary meaning of "verification" is: (1) "evidence that establishes or confirms the accuracy or truth of something"; (2) "the process of research, examination, etc., required to prove or establish authenticity or validity"; (3) "a formal assertion of the truth of something, as by oath or affidavit"; and (4) "a short confirmatory affidavit at the end of a pleading or petition." *Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 758 F.3d 777, 782-83 (6th Cir. 2014) (quoting *Random House Unabridged Dictionary* 2113 (2d ed.1993). "Verify" has a similar meaning in the legal context. *See Black's Law Dictionary*

17/28

1793 (10th ed. 2014) ("**verify** vb. (14c) **1.** To prove to be true; to confirm or establish the truth or truthfulness of; to authenticate. **2.** To confirm or substantiate by oath or affidavit; to swear to the truth of."). Finally, the term "investigation" is defined as "[a] detailed inquiry or systematic examination" or "a searching inquiry." *Johnson*, 357 F.3d at 430 (quoting *Am. Heritage Dictionary* 920 (4th ed. 2000); *Webster's Third New Int'l Dictionary* 1189 (1981)).

These definitions support the conclusion that § 1681s-2(b) requires some degree of careful inquiry by furnishers of information. In particular, when a furnisher does not already possess evidence establishing that an item of disputed information is true, § 1681s-2(b) requires the furnisher to seek out and obtain such evidence before reporting the information as "verified." *See id.* at 431 (reversing summary judgment because a reasonable jury could find a violation of § 1681s-2(b) where the furnisher "d[id] not look beyond the information contained in the [internal data file] and never consult[ed] underlying documents such as account applications"); *cf. Cahlin*, 936 F.2d at 1160 (observing that a claim for failure to investigate "is properly raised when a particular credit report contains a *factual deficiency or error that could have been remedied by uncovering additional facts*"). The requirement to uncover additional facts will be more or less intensive depending on what evidence the furnisher already possesses. For instance, a debt buyer with account-level documentation or more comprehensive warranties from

16/28

information is unverifiable.  Furnishers can avail themselves of this option if they determine that the evidence necessary to verify disputed information either does not exist or is too burdensome to acquire.  Having made such a determination, furnishers are entitled to cease investigation and notify the CRAs that the information "cannot be verified."  *See* 15 U.S.C. § 1681s-2(b)(1)(E).  When a furnisher reports that disputed information "cannot be verified," the question of whether the furnisher complied with § 1681s-2(b) will likely turn on whether the furnisher reasonably determined that further investigation would be fruitless or unduly burdensome.[8]  The final way to satisfy § 1681s-2(b) is to conduct an investigation and conclude that the disputed information is "inaccurate or incomplete."  *Id.*

This framework reflects the fact that §1681s-2(b) is designed not only to exclude false information from credit reports, but also to prevent the reporting of unverifiable information.[9]  When a furnisher determines that disputed information is false or "cannot be verified," the furnisher must notify the CRAs of this result pursuant to § 1681s-2(b)(1).  The furnisher must also "as appropriate, based on the

---

[8] The present case involves a report of "verified" and thus does not require us to delineate a standard for cases involving a report of "cannot be verified."  We emphasize, however, that by characterizing § 1681s-2(b) as presenting a furnishers with a "choice" we do not mean to suggest that furnishers have complete discretion to cease investigation and report accounts as "cannot be verified."

[9] Any other reading would render meaningless the "cannot be verified" option in § 1681s-2(b)(1)(E).  *See Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1204 (11th Cir. 2007) ("[W]e must construe [a] statute to give effect, if possible, to every word and clause.").

20/25

results of the reinvestigation promptly . . . modify[,] . . . delete [or] permanently block the reporting" of that information to CRAs. *Id.* § 1681s-2(b)(1)(E). What "the results of the reinvestigation" require may vary depending on the nature of the disputed information. But when a furnisher is unable to verify the identity of an alleged debtor, we are persuaded by the parallel structure of §§ 1681s and 1681i that the appropriate response will be to delete the account or cease reporting it entirely. *See id.* § 1681i(d) ("Following any *deletion* of information which is found to be inaccurate *or whose accuracy can no longer be verified* [the CRA shall] furnish notification that the item has been deleted . . . to any person specifically designated by the consumer . . . ." (emphasis added)). Similarly, when a CRA receives notice that an account is unverifiable, it must "promptly delete that item of information from the file of the consumer." *See id.* § 1681i(a)(5)(A)(i). Lest this result appear too strict, we hasten to observe that even though a furnisher that ends an investigation without verifying a disputed account must cease reporting the account to CRAs, § 1681s-2(b) does not require the furnisher to cease dunning or otherwise attempting to collect the debt. The requirement to delete or modify the offending information is limited to the credit-reporting context. *See id.*

We are not the only circuit court to recognize this framework. In *Johnson*, the Fourth Circuit considered whether a bank reasonably investigated a dispute alleging that the consumer was not a co-obligor but merely an authorized user on a

19

2/15

credit card account. 357 F.3d at 431. The bank investigated whether the consumer was a co-obligor by "(1) confirming that the name and address listed on the [dispute] were the same as the name and address contained in [its computerized data file], and (2) noting that [the data file] contained a code indicating that [the consumer] was the sole responsible party on the account." *Id.* The bank "d[id] not look beyond the information contained in the [data file] and never consult[ed] underlying documents such as account applications." *Id.* The Fourth Circuit held that "[b]ased on this evidence, a jury could reasonably conclude that [the bank] acted unreasonably" when it reported to the CRA that the disputed information was "verified." *Id.* The bank argued that its reliance on computerized data was reasonable because it had destroyed any account-level documentation pursuant to a document retention policy. *Id.* at 432. But the court rejected this argument, explaining that a reasonable jury could find that the bank should have "at least informed the credit reporting agencies that [it] could not conclusively verify" the disputed information. *Id.*

The reasoning of *Johnson* is doubly persuasive in the case of a down-the-line buyer like Midland. Faced with a mistaken-identity dispute, Midland investigated the dispute by confirming that the identifying information possessed by the CRAs was the same as the identifying information contained in its internal data files. The information contained in the data files was obtained from AIS and



appropriate. A reasonable jury could find that Midland adopted such a system with reckless disregard for the fact that it would result in perfunctory review in contravention of the FCRA. We therefore hold that a reasonable jury could find that Midland willfully violated § 1681s-2(b) when it reported the GE/Meijer and T-Mobile accounts as "verified" without obtaining sufficient documentation that the debts in fact belonged to Hinkle.

## V.  CONCLUSION

For the foregoing reasons, we conclude that the district court erred in dismissing Hinkle's claims under 15 U.S.C. § 1681s-2(b). We reverse and remand as to § 1681s-2(b). We affirm dismissal of all other claims.

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**

